# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

---

**SECURITIES AND EXCHANGE COMMISSION,**
100 F Street, N.E.
Washington, DC 20549

**Plaintiff,**

**v.**

**EDWARD F. PANOS,**
3700 Wrangler Way
Park City, UT 84098                                Civ. No. 16-cv-02473

**Defendant,**

**and**

**ALLISON G. PANOS,**
3700 Wrangler Way
Park City, UT 84098

**Relief Defendant.**

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against Defendant Edward F. Panos ("Panos"):

## SUMMARY OF ALLEGATIONS

1.      This action concerns fraudulent and manipulative trading in the stock of E-Waste Systems, Inc. ("EWSI") and its predecessor, Dragon Beverage Corp. ("Dragon Beverage"), from at least 2008 through 2013, by Panos.  Panos orchestrated this scheme with the help of a network of professionals and other individuals.

2.      Panos made a career out of creating shell companies, taking them public, and selling them to private entities for hundreds of thousands of dollars.  Before selling his public

shells, he issued shares to himself and his associates in the names of various entities and nominees, to disguise the extent of his beneficial ownership.  After selling the shells, he orchestrated paid promotional campaigns to artificially increase the price of the shares, and then sold his shares into the inflated market.

3.     As part of the EWSI scheme, Panos caused Dragon Beverage to be incorporated as a private non-operating company in 2008 and placed a figurehead, whom he controlled, as the sole officer and director of the company.  Panos subsequently directed the actions of the Dragon Beverage CEO and made strategic decisions on behalf of Dragon Beverage, but none of Dragon Beverage's public filings or press releases disclosed Panos' involvement.

4.     Panos provided the funds and requisite paperwork for Dragon Beverage's sole officer to seek out phony "investors" willing to permit their names to be used for a sham private offering.

5.     After registering the sham offering through a Form S-1 registration statement, thereby taking Dragon Beverage public effective September 10, 2010, Panos directly and indirectly acquired more than 5% of Dragon Beverage stock through accounts held in his name and various entities controlled by him, including several nominee accounts that did not bear his name.  Panos never publicly disclosed his beneficial ownership interest in Dragon Beverage.

6.     Panos then unilaterally agreed to turn over control of Dragon Beverage, which was still non-operating, to E-Waste Systems (UK) Ltd. ("E-Waste UK"), a private company interested in entering the public markets.  Panos orchestrated a name-change in Dragon Beverage to EWSI, and appointed E-Waste UK's CEO as CEO of EWSI.  Months later, Panos instructed the Dragon Beverage CEO to transfer his majority interest in the company to the EWSI CEO.

7.      Following the change in control of Dragon Beverage and name change to EWSI, Panos orchestrated promotional campaigns in EWSI to increase trading volume and share price. He then sold his EWSI shares into the artificially-inflated market for proceeds of more than $1 million.

8.      By engaging in this conduct, Panos violated and/or aided and abetted violations by others of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)] and Sections 10(b), 13(g), and 20(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(g), and 78t(b)] and Rules 10b-5 and 13d-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1].

9.      Panos directly or indirectly transferred to Relief Defendant Allison G. Panos at least $550,000 in proceeds from his misconduct.  Allison Panos used the funds to purchase, among other things, a home in the name of Relief Defendant Allison Panos.  Panos resided in that home with Allison Panos, and it was their primary residence until they sold it, and the proceeds were deposited by Allison Panos into her personal bank account.

10.      With this complaint, the Commission seeks injunctive relief, disgorgement of ill-gotten gains together with prejudgment interest, and civil penalties.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. §§ 1331.  Panos has consented to jurisdiction and waived any objection to venue in this Court.

## PARTIES AND RELATED ENTITIES

12.      **Edward F. Panos** is 46 years old and a resident of Park City, Utah.  Panos owns

and/or controls numerous entities that he has employed in this and other schemes, including, but

not limited to, Panos Industries, LLC; Panos International Investment Fund, LLC; Andorra

Capital Group, Inc.; EFP Advisors, LLC; Ephemeral Development Inc.; Northwood Capital,

Inc.; Broadway Family Group, LLC; and Creative Omega Marketing, Inc.

13.      **E-Waste Systems, Inc.** ("EWSI") is a Nevada corporation formerly known as

Dragon Beverage, Inc. ("Dragon Beverage"), which lists a Las Vegas, NV mailbox facility as its

principal place of business.  Dragon Beverage became an SEC-reporting company on September

10, 2010, and purported to manufacture and sell energy drinks.  After changing its name to

EWSI on May 5, 2011, the company purported to be in the e-waste recycling business operating

out of a facility in Columbus, Ohio.  EWSI's shares are traded on OTC's Bulletin Board, but it

has not made a public filing in approximately two years, and it has no operations.

14.      **Allison G. Panos** ("Relief Defendant") is 41 years old and a resident of Park City,

Utah.  She is the wife of Panos.

## FACTS

**A.      Panos Created Dragon Beverage as a Public Shell Company, Installed a Figurehead
Officer and Director, and Arranged for a Sham Private Offering.**

15.      On or around December 19, 2008, Panos caused Dragon Beverage to be

incorporated as a private Nevada corporation.  With the assistance of outside counsel, and using

draft documents prepared for other issuers, Panos drafted Dragon Beverage's Articles of

Incorporation and By-Laws, and had his brother-in-law execute both documents.  Panos' brother-

in-law was named as the sole officer and director of Dragon Beverage.

16.     On or around February 5, 2010, Panos arranged for his brother-in-law to resign from the position as CEO and Sole Director of Dragon Beverage, and for a new figurehead CEO and Sole Director ("Dragon Beverage CEO") to be appointed.

17.     The Dragon Beverage CEO was 24-years old at the time of his appointment, a childhood friend of Panos' personal assistant, and had no prior experience operating a company.

18.     On or around February 15, 2010, the Dragon Beverage CEO and Panos' personal assistant were granted signature authority on Dragon Beverage's bank account.

19.     Around this same time, Panos directed outside counsel to draft two sets of Dragon Beverage board resolutions.  The first set of board resolutions directed the issuance of a Private Placement Memorandum for a maximum offering of $3,000 or 3,000,000 shares of Dragon Beverage common stock at an offering price of $0.001 per share, under Section 4(2), Rule 504 of Regulation D thereunder, of the Securities Act.  The second set of board resolutions appointed a transfer agent, and authorized the transfer agent to issue and countersign any Dragon Beverage share certificates.

20.     Using drafts of documents prepared for other issuers in connection with other Panos business dealings, and with the assistance of outside counsel and others, Panos drafted all of the documents related to this private offering, including the private placement memorandum, subscription agreements, stock purchase agreements, and stock powers of attorney.

21.     On or around February 18, 2010, the Dragon Beverage CEO executed both sets of board resolutions drafted by Panos.

22.     In or around February 2010, Panos provided the Dragon Beverage CEO with cash funds and directed him to seek out phony "investors" willing to permit their names to be used for a sham private offering.

23.     The private offering began on February 20, 2010.  Between February and March 2010, the Dragon Beverage CEO, together with Panos' personal assistant, approached thirty of their family, friends from college, and friends of friends to "purchase" shares of Dragon Beverage.

24.     These thirty individuals were asked to write a check for $100 made out to Dragon Beverage and to sign a subscription agreement "purchasing" 100,000 shares of Dragon Beverage at a price of $0.001 per share.  By signing the subscription agreement, these investors claimed to be "accredited investors," as defined by Rule 501 of regulation D of the Securities Act, and to have significant knowledge or experience in finance, securities, or investments, and to have knowledge or experience with non-listed and non-registered securities.  Almost all of these "investors" were students at The Ohio State University.  None of the thirty individuals who signed a subscription agreement was an accredited investor or had significant knowledge or experience in finance, securities, investments or any knowledge with non-listed and non-registered securities.

25.     Most of these initial "investors" were also asked to sign a stock purchase agreement at the same time they signed their subscription agreement, causing the shares they had just purchased to be immediately sold.  However, the sale price, name and signature of the purchaser, and date on the stock purchase agreements were left blank.

26.     On or around the same day that an "investor" provided a check to the Dragon Beverage CEO or Panos' assistant, he was reimbursed in cash the full amount of his $100 check with funds provided by Panos, and, in some instances, received a small incentive payment of up to $100.

27.     The checks collected from these initial "investors" were deposited into Dragon Beverage's bank account by either the Dragon Beverage CEO or Panos' assistant.

28.     Upon information and belief, none or almost none of the initial sham investors received a share certificate or deposited any Dragon Beverage shares into a brokerage account.

29.     The subscription agreement and share purchase agreements signed by investors were delivered to Panos.

30.     The private offering terminated on March 30, 2010.

31.     On or around March 22, 2010, the Dragon Beverage CEO was issued 5,000,000 shares of Dragon Beverage common stock, a total of 62.5% ownership interest.  These shares were not deposited into a brokerage account.

32.     Panos took the steps described above, in substantially the same manner, in connection at least three other microcap and penny stock issuers, Savoy Energy, Inc. ("Savoy"), Biologix Hair, Inc. ("Biologix"), and Common Horizons, Inc. ("Common Horizons"), as part of similar schemes to defraud investors.

**B.     Panos Took Dragon Beverage Public and Accumulated a Large Position in Dragon Beverage.**

33.     After Dragon Beverage's sham private offering was complete, Panos retained and paid the same outside counsel and external auditors that he used with Savoy and Biologix to draft a Form S-1 registration statement and any necessary accompanying documents for Dragon Beverage, including opinion letters, financial statements, and audited accounts.  Panos paid for these services from bank accounts under his control.

34.     On or around April 1, 2010, Panos arranged for Dragon Beverage's Form S-1 to be filed with the Commission.  The Form S-1 was amended five times.  The final amended Form S-1 was filed on or around August 23, 2010, and became effective on September 10, 2010.

35.     In its Form S-1, Dragon Beverage purported to manufacture and sell energy drinks.  The Form S-1 sought to register a total of 8,000,000 shares of Dragon Beverage common stock: 5,000,000 shares in the name of the Dragon Beverage CEO and the 3,000,000 shares purportedly held by the thirty investors from the private offering.

36.     Since the thirty initial "investors" did not participate in a private offering, and neither purchased nor owned, nor had any intent to purchase or own, the 3,000,000 shares of Dragon Beverage common stock, Dragon Beverage failed to properly register the sham private offering.

37.     The Form S-1 stated that Dragon Beverage "used cash from sales of common stock and loans from [the Dragon Beverage CEO] to fund expenses to date."  However, Panos admitted to funding all of Dragon Beverage's expenses, including the cost of registration.

38.     After the Form S-1 went into effect, Panos hired and paid a broker to file a Form 211 with the Financial Industry Regulatory Authority to initiate quotation of Dragon Beverage on the OTC Bulletin Board and Pink Sheets.  The Form 211 was filed on October 6, 2010. Dragon Beverage initiated quotation on the OTC Bulletin Board on November 12, 2010.

39.     The Form 211 stated that the Dragon Beverage CEO found the broker that filed the Form 211 on pinksheets.com.  Panos, however, had an existing relationship with this broker and had used his services for this same purpose over previous iterations of this scheme with other issuers, including at least Savoy and Biologix.  The Dragon Beverage CEO was not involved in selecting the broker.

40.     The Form 211 also stated that "no person or entity ha[d] control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed in the S-1/A other than the person or entity identified as the shareholder.  This statement includes any

past, present, or future arrangements."  At the time of this statement, Panos was already in possession of all or most of the stock purchase agreements that had been signed by the thirty initial sham "investors," relinquishing control of their shares.

41.    Between April 2010 and spring 2011, Panos filled in the dates, names of the purchasers, and purchase amounts for each stock purchase agreement, assigning shares to himself, nominee accounts he controlled, and to his business associates.   These shares were transferred to accounts in Panos' name and in the name of various entities controlled by him. Panos intentionally kept each account under the 5% reporting threshold, to evade reporting requirements.  Panos did not pay the stated purchase price to any of the original "investors" listed on the registration statement.

42.    Some of the accounts controlled by Panos, into which he deposited Dragon Beverage shares, do not bear his name.  Some bear the names of entities he created for this purpose, while others bear the name of individuals who permitted Panos to use their accounts.

43.    Through his control of Dragon Beverage shares across his various accounts, between March 2010 and approximately June 2012, Panos accumulated greater than a 5% beneficial ownership interest in Dragon Beverage, which he did not publicly disclose as required by Section 13(d) of the Securities Exchange Act of 1934.

44.    Panos took the steps described above, in substantially the same manner, in connection at least two other issuers, Savoy, Biologix, and Common Horizons, as part of similar schemes to defraud investors.

## C.    Panos Arranged for EWSI to Assume Control of Dragon Beverage.

45.    Sometime in late 2010 or early 2011, Panos met with the CEO of E-Waste Systems (UK) Ltd. ("E-Waste UK"), a non-operating private company based in London, England that purported to be in the e-waste recycling business.  The CEO of E-Waste UK

("EWSI CEO") was interested in locating a public shell that he could use to access the public markets in the United States.  Panos was introduced to the EWSI CEO through his network of professionals and other individuals, who had also helped him find buyers for other shell companies.

46.     Without consulting the Dragon Beverage CEO, Panos came to an agreement with the EWSI CEO whereby E-Waste UK would become a subsidiary of Dragon Beverage, and E-Waste UK would assume control of Dragon Beverage.

47.     Panos did not disclose to the EWSI CEO that he held a significant beneficial ownership interest in Dragon Beverage at this time or at any point in the future.

48.     On or around March 15, 2011, Panos arranged for Dragon Beverage's authorized shares to increase from 10,000,000 to 200,000,000.

49.     That same day, Panos also arranged for Dragon Beverage to conduct a 1:12.5 forward stock split.  The 8,000,000 outstanding shares of Dragon Beverage common stock increased to 100,000,000 of outstanding common stock.

50.     On or around May 5, 2011, Panos arranged for Dragon Beverage to change its name to EWSI.  Around this same time, although he was not yet an officer or director and did not yet own any shares in EWSI, the EWSI CEO assumed control of EWSI.

51.     On or around June 22, 2011, Panos arranged for the Dragon Beverage CEO to resign from his roles as sole officer and director of EWSI.  On that same day, the EWSI CEO became Chairman of EWSI's Board of Directors and EWSI's President, CEO, and CFO.  One of Panos' business associates, who had participated in past iterations of this scheme with Panos in at least Savoy and Biologix, was appointed Secretary and Treasurer of EWSI that same day as well.

52.     On or around December 9, 2011, Panos arranged for the Dragon Beverage CEO to transfer his 62.5% ownership interest in the company (62.5 million shares) to the EWSI CEO. Although the transfer was effected pursuant to a share purchase agreement that stated a $5,000 purchase amount, the EWSI CEO never paid any amount to the Dragon Beverage CEO for these shares.

53.     Panos orchestrated similar changes in control in connection at least three other issuers, Savoy, Biologix, and Common Horizons, as part of similar schemes to defraud investors. Upon information and belief, Panos also orchestrated changes in control for a number of other public shell companies, including orchestrating the sale of The Language Access Network, Inc. to IB3 Networks, Inc. and the sale of Alba Mineral Exploration, Inc. to Bergio International, Inc.

**D.     Panos Arranged for Paid Promotional Campaigns to Artificially Inflate Price and Volume of EWSI Shares, and Sold His Shares Into The Artificially Inflated Market.**

54.     In December 2011, with the knowledge and consent of the EWSI CEO, Panos arranged to have a report published about EWSI to increase trading volume and share price. Panos paid for publication of this report from bank accounts under his control.  The report was published online on or around December 20, 2011, and Panos distributed it to EWSI and to his business associates for broader distribution in late December 2011 and early January 2012.

55.     In early January 2012, Panos engaged the services of a stock promoter to conduct a promotional campaign for EWSI.  In exchange for payment from Panos, the promoter agreed to call brokers for a one-month period and tout EWSI as a good investment.  The campaign began on or around January 18, 2012.  Panos paid the promoter $50,000 cash and 200,000 shares of EWSI common stock from his holdings.

56.     Over the next two weeks, EWSI's share price increased from $1.05 per share to $1.65 per share.

57.     Panos monitored EWSI's share price and volume during the one-month promotional period, and sold EWSI shares across various accounts held by him during this period, and profited from the sale of those shares.

58.     In or around February 2012, Panos instructed his assistant to contract for a paid email campaign to promote EWSI.  Panos gave his assistant the funds to pay for the campaign. The promotional campaign ran on February 2, 2012, and involved mass emailing as well as publication of promotional material on at least two separate microcap promotion sites.

59.     In the two weeks following this February 2, 2012 paid promotional campaign, EWSI's share price increased from $1.65 per share to $1.92 per share.  Panos monitored EWSI's share price and volume during this time-frame, and sold EWSI shares into the campaign using various accounts held by him, and profited from the sale of those shares.

60.     Upon information and belief, Panos orchestrated similar promotional campaigns in connection with several other issuers, including Savoy, Biologix, IB3, Bergio, and Capital City Energy Group, Inc., as part of similar larger schemes to defraud investors, and profited from the sale of his shares at prices he had artificially inflated through such campaigns.

**E.     Panos Made Unregistered Sales of Dragon Beverage and EWSI Securities**

61.     Between March 2011 and January 2014, Panos sold Dragon Beverage and EWSI common shares to unsuspecting shareholders through brokered over-the-counter transactions. Panos sold these shares while he was an undisclosed control person for, and affiliate of, Dragon Beverage and EWSI.

62.     Panos had acquired these shares through stock purchase agreements from the original thirty Dragon Beverage shareholders.  However, Dragon Beverage's Form S-1 did not properly register the sham private offering to these initial shareholders.  As a result, Panos' subsequent sales of those shares were also unregistered.

63.     The stock purchase agreements that Panos executed to purchase these shares indicated that the original shareholder received anywhere between $500 and $2,500 as consideration for the purchase of those shares.  However, Panos provided no such consideration. As a result, the holding period for those shares in Panos' possession never began running. Because the holding period was not satisfied, and the prior transactions were not otherwise registered, the shares remained restricted and unavailable for resale on the open market.

64.     Panos also sold at least 200,000 shares of EWSI shares in private transactions. On August 15, 2011 and again on December 8, 2011, Panos sold 100,000 shares of EWSI pursuant to separate stock purchase agreements.  Like his sales on the open market, those private transactions were also unregistered.  The stock purchase agreements for these sales improperly omit mention of the existing restrictions on the shares.

### FIRST CLAIM FOR RELIEF
### (Against Defendant Edward F. Panos)

**Scheme or Artifice to Defraud in Connection with Sale of Securities
Violations of Section 17(a) of the Securities Act and
Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

65.     The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

66.     Panos participated in a scheme to defraud in connection with his sale of securities in Dragon Beverage and EWSI as well as other private and public companies.

67.     Panos engaged in conduct that was part of this scheme when he formed Dragon Beverage as a shell company; installed a figurehead officer and director, whom he controlled; instructed the figurehead to obtain initial investors for a sham private offering; attempted to register the shares from the sham private offering through the filing of registration statements that he knew contained false statements; arranged to turn over control of the public shell to a private company; paid for promotional activities to artificially inflate the price and trading

volume of the stock; and sold shares into that artificially inflated market, at a profit.

68.     Panos made, and obtained money or property by means of, untrue statements of material fact and/or omissions of material fact.

69.     In implementing this fraudulent scheme, Panos used means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

70.     As a result of this fraudulent scheme, individuals purchased shares in various shell companies, including EWSI, at artificially inflated prices.

71.     Panos profited from this fraudulent scheme.

72.     By engaging in the conduct described above, Panos, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

        a.     Employed devices, schemes, or artifices to defraud;

        b.     Made and obtained money or property by means of  untrue statements of material facts or omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

        c.     Engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

73.     By engaging in the foregoing conduct, Panos violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 78q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10-b-5].

## SECOND CLAIM FOR RELIEF
### (Against Defendant Edward F. Panos)

**Failure to Disclose Beneficial Ownership**
**Violations of Section 13(g) of the Exchange Act**

74.     The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

75.     Panos acquired beneficial ownership in Dragon Beverage and EWSI through various accounts controlled by him but not held in his name.

76.     Panos used accounts not in his name intentionally to hide his beneficial ownership of Dragon Beverage.

77.     Panos, directly or indirectly, acquired beneficial ownership of more than 5% of Dragon Beverage and EWSI.

78.     Panos failed to file with the Commission a statement of beneficial ownership for Dragon Beverage and EWSI.

79.     By engaging in the foregoing conduct, Defendant violated, and unless enjoined will continue to violate, Section 13(g) of the Exchange Act [15 U.S.C. § 78m(g)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1].

## THIRD CLAIM FOR RELIEF
### (Against Defendant Edward F. Panos)

**Sale of Unregistered Securities in Violation of Section 5(a) of the Securities Act**

80.     The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

81.     The shares of Dragon Beverage and EWSI held by Panos were not registered in accordance with the provisions of the Securities Act and no exemption from registration was applicable.

82.     Panos, therefore, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and to sell

securities when no registration statement had been filed or was in effect as to such offers and sales of such securities and no exemption from registration was available.

83.     By engaging in the foregoing conduct, Panos violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## FOURTH CLAIM FOR RELIEF
### (Against Defendant Edward F. Panos)

### Unlawful Activity Through or By Means of Any Other Person
### Violation of Section 20(b) of the Exchange Act

84.     The SEC realleges and incorporates by reference paragraphs 1 through 83 above.

85.     Panos has acted through other persons, including the issuers set forth above, his personal assistant, the Dragon Beverage CEO, and other business associates, to commit violations of the securities laws as set forth above.

86.     By committing violations of the securities laws as described above through other persons, Panos has violated, and unless enjoined will continue to violate, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## FIFTH CLAIM FOR RELIEF
### (Against Relief Defendant Allison G. Panos)

### Unjust Enrichment

87.     The SEC realleges and incorporates by reference paragraphs 1 through 64 above.

88.     Relief Defendant Allison G. Panos received and, to this day, continues to have access to and enjoy funds that were directly or indirectly transferred to her by Panos, and over which she has no legitimate claim.

89.     Relief Defendant Allison G. Panos received these funds as part of, and as a consequence of, the securities law violations by Defendant Panos alleged above, under circumstances in which it is not just, equitable, or conscionable for her to retain the proceeds.

90.     By reason of the foregoing, Allison G. Panos has been unjustly enriched and must disgorge the amount of the ill-gotten gains she received directly or indirectly from Panos.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully request that the Court enter Final Judgment:

### I.

Permanently restraining and enjoining Panos, and his agents, servants, employees, attorneys and those persons in active concert or participation with him, who receive actual notice of the order by personal service or otherwise, from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Sections 10(b), 13(g), and 20(b) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(g), and 78t(b)] and Rules 10b-5 and 13d-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)];

### II.

Prohibiting Panos from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

### III.

Prohibiting Panos from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Section 20(b) of the

Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C.
§ 78u(d)(6)(A)];

## IV.

Prohibiting Panos from causing or deriving any compensation from the promotion,
advertising, endorsing, or marketing of any issuer of any penny stock;

## V.

Ordering Panos to disgorge the proceeds of Panos' illegal conduct described herein, plus
prejudgment interest;

## VI.

Ordering Panos to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C.
§ 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## VII.

Ordering Relief Defendant Allison G. Panos to disgorge the amount by which she was
unjustly enriched, with prejudgment interest;

## VIII.

Retaining jurisdiction of this action in accordance with the principles of equity and the
Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and
decrees that may be entered or to entertain any suitable application of motion for additional relief
within the jurisdiction of this Court; and

## IX.

Granting such other and further relief as this Court may determine to be just and necessary.

Dated: December 19, 2016

Respectfully submitted,

*/s/ Suzanne J. Romajas*

Suzanne J. Romajas
Scott W. Friestad
Jeffrey Finnell
Virginia M. Rosado Desilets
Sonia G. Torrico
Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549-5971
Direct: 202-551-4473
Email: RomajasS@sec.gov

Attorneys for Plaintiff